THOMAS J. CREAGHAN AND SAMUEL G. IMWOLD

*vs.*

MAYOR AND CITY COUNCIL OF BALTIMORE AND
JOHN D. BLAKE, COMMISSIONER OF HEALTH.

*Municipal ordinances: injunctions to restrain; interest of com-
plainant.   Milk ordinance of Baltimore City: not
delegation of legislative authority.*

The enforcement of a void ordinance may be enjoined at the
instance of any party whose interests will be affected by its
execution.                                        p. 448

An ordinance may be valid in part and void in part, even
where two parts are contained in one section, provided that
the valid part is independent of and severable from the part
which is void.        .                           p. 448

Where an ordinance contains many sections and provisions,
a bill of complaint seeking to have it declared null and void
and its execution enjoined should point out those sections and
provisions which are claimed to be unconstitutional, with suffi-
cient averments to show that the complainant's interests would
be injuriously affected by their enforcement.        p. 448

Ordinance No. 262 of the Mayor and City Council of Balti-
more, of June 1, 1917, regulating the sale of milk, etc., was
passed under the exercise of the police power expressly con-
ferred by the City Charter (Acts of 1898, Chapter 123)  p. 449

The preservation of the health and safety of the inhabitants
is one of the chief purposes of local governments, and reason-
able laws in relation thereto are usually within their incidental
authortiy.                                        p. 450

This ordinance does not attempt to delegate legislative power
to the Commissioner of Health, but authorizes him to exact
compliance with the provisions thereof and with such regula-
tions as he may adopt for their enforcement, and gives him only
such discretion as is necessary to prevent the sale of impure
milk in the City of Baltimore.                              p. 462

The averment that owing to war conditions and scarcity of
labor the plaintiffs were unable, within the time allowed by the
ordinance, to make the required changes in their dairies, etc.,
was held no ground for enjoining the enforcement of an ordi-
nance deemed necessary to preserve public health.          p. 463

*Decided April 3rd, 1918.*

Appeal from the Circuit Court of Baltimore City.
(STUMP, J.)

The cause was argued before BOYD, C. J., BRISCOE,
THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE,
JJ.

*Isaac Lobe Straus,* for the appellants.

*Alexander Preston, Deputy City Solicitor,* (with whom
was *Samuel S. Field, City Solicitor,* on the brief), for the
appellee.

THOMAS, J., delivered the opinion of the Court.

This appeal is from a decree of the Circuit Court of Bal-
timore City sustaining a demurrer to and dismissing the bill
of complaint filed by the appellants against the Mayor and
City Council of Baltimore and John D. Blake, Commissioner
of Health, to have Ordinance No. 262 of the Mayor and City
Council of Baltimore declared null and void, and for an in-
junction restraining the enforcement of the same.

The bill alleges that the plaintiff, Thomas J. Creaghan,
was a resident and taxpayer of Baltimore City, and at the
time of the filing of the bill, and for twenty-eight years prior

thereto, was engaged in the retail milk and dairy business
in Baltimore City, during all of which time he had conducted
the business in a proper and sanitary manner, and had de-
livered to his customers wholesome milk and dairy products;
that the plaintiff, Samuel G. Imwold, was a resident and tax-
payer of Baltimore County, and owned and operated a dairy
farm in that county, having in his herd about one hundred
cows and at the time of the filing of the bill milking sixty
cows; that he retailed loose milk, the product of his own herd
and the herds of others; that he maintained his herd in a
healthy and sanitary condition, "and that the herds of the
others from whom he produces milk" were likewise kept in
a healthy and sanitary condition; that his plant in Baltimore
County, which was of great value, had been inspected by city
inspectors and state inspectors; that he had never had any
"trouble under such inspection"; "that for twenty-eight years
past he has retailed milk to the consumers in Baltimore City
from the churn, properly iced, of high grade, wholesome and
fit for human consumption; that all of his assistants at said
dairy farm and engaged in the delivery of the product thereof
are also kept in a clean, healthy and sanitary condition."

The bill further alleges that on the first day of June,
1917, the Mayor and City Council of Baltimore passed an
ordinance, known as Ordinance No. 262, which provided,
in Section 6, that it should take effect five months after the
date of its passage; that there was no statute of the State
authorizing the ordinance, and that the same is "unconsti-
tutional and in contravention of the twenty-third paragraph
of the Bill of Rights of the State of Maryland and the Four-
teenth Amendment of the Constitution of the United States,
in that it deprives citizens of Baltimore City and non-resi-
dents of Baltimore City of their property without due proc-
ess of law, and without any warrant or authority whatso-
ever; and interferes with their personal liberties"; that
"many portions of said ordinance are void in that it attempts
to empower said Commissioner of Health to use unlimited

and unbounded discretion in granting or refusing or revoking permits therein provided for, and does not undertake to provide any general rules or regulations limiting the exercise of said discretion"; that it "fails to provide for proper notice and hearing or appeal from the results of the exercise of such discretion as therein provided to any properly constituted judicial tribunal, so that the powers attempted to be granted to said Commissioner of Health may be exercised in a whimsical, capricious, ignorant, fraudulent or dishonest manner without any opportunity to your orators or either of them for an appeal from or a correction of such action on the part of such Commissioner of Health"; "that such regulations as are prescribed by said ordinance are arbitrary, unreasonable, unfair, unjust and the provisions thereof provide for the exercise of the will or discretion of a municipal officer unrestrained by any prescribed general rule of law, placing him in a position where he may give permits to some and refuse permits to others under the same conditions, and permit such citizens as he may like to conduct their lawful business and prevent others from so conducting their lawful business, to the great hurt and detriment of such others, to their ruin and the confiscation of their property"; that the "ordinance attempts to delegate legislative power to the Commissioner of Health in that it attempts to empower him to make regulations for the sale of milk or cream below the requirements for standard milk pasteurized and standard cream pasteurized; for sterilization of milk; for standardization or adjustment of milk; for the requirement for the production of the aforesaid grades of milk; for the production, pasteurization and handling of all milk, skimmed milk, or cream, held, kept, or offered for sale, sold or delivered for consumption in the City of Baltimore, or used for the manufacture of ice cream or butter, buttermilk, or other fermented milks, whey or curd, in the City of Baltimore; for the increasing of temperature for pasteurization; for the application of the tuberculin test; for the making of the grades of

milk established or attempted to be established by said ordinance; for excusing from compliance with the expressed terms of said ordinance; for the naming of the conditions under which selected milk pasteurized or selected cream pasteurized may be sold in Baltimore City; for excusing compliance otherwise necessary under Rule 5, Section 59E of said ordinance; for keeping, offering for sale, selling, delivering or using in the City of Baltimore milk or cream below standard milk or cream; for discoloring or denaturing milk or cream; for keeping milk at a higher temperature than otherwise by said ordinance allowed; for inspecting or investigating the herd, the farm and its equipment, of the producer, outside of Baltimore City and the jurisdiction of the defendants and each of them; for producing, handling, selling or distributing raw milk and cream; for removing infected cattle from herds outside of Baltimore City; for regulating and fixing the character and equipment of the farm for the production of raw milk outside of Baltimore City; for declaring the conditions under which any condensed milk, condensed cream, evaporated milk, evaporated cream or other milk or cream products may be sold in Baltimore City, and, generally, to transact many other things without legislative assent"; that the "enforcement of the powers thus attempted to be conferred upon the Commissioner of Health will unequally affect the rights of your orators and of other persons engaged in like trade or business * * * and cause other irreparable damage," and "that all and each of said powers so attempted to be conferred are *ultra vires*"; "that although the respective business of your orators, as aforesaid, are not now and never have been nuisances in fact or in law, nevertheless, under the terms of said ordinance they may be so declared by the mere dictum of said Commissioner of Health, and your orators may be deprived of their business and means of livelihood"; that the ordinance, if enforced, will forbid the entrance of perfectly clean and healthy milk into the City of Baltimore, "except at

the pleasure of the Commissioner of Health"; that under the provisions of the ordinance it will take effect on the first day of November, 1917, and that the defendants had given notice to the plaintiffs and others that the ordinance would be enforced at that time; that the enforcement of the ordinance would be ruinous to the established business of the plaintiffs and each of them, and of the milk business of the majority of milk dealers in Baltimore City, and the damages arising from such enforcement would be irreparable, and that, "owing to war conditions," and the scarcity of labor and metal, it had been impossible ever since the passage of the ordinance to make such "changes in the plants of dairies operating in Baltimore City and in milk-producing farms and plants as are necessary in order to comply with its provisions."

The bill then prayed that the ordinance referred to, "and each and every part thereof," be declared null and void, and that the defendants be enjoined from enforcing or attempting to enforce it.

The ordinance, which was filed as an exhibit with the bill, is entitled: "An ordinance to repeal Sections 55A, 56A, 56B and 59 of Article 14 of the Baltimore City Code of 1906, title 'Health,' sub-title 'Food, Food Products and Milk,' as amended by Ordinance 103, approved May 6, 1908, and to reordain said sections with amendments, and to add twelve new sections to said article, to be designated Sections 55E, 59A, 59B, 59C, 59D, 59E, 59F, 59G, 59H, 59 I, 59 J and 59K, and to further regulate the production, manufacture, handling, sale and distribution of milk and cream products in Baltimore City."

Notwithstanding the ordinance itself covers more than twenty-six printed pages, and is an amendment of and an addition to Article 14 of the Baltimore City Code of 1906, as amended by Ordinance 103 of May 6, 1908, containing many other provisions dealing with the same subject-matter, the plaintiffs nowhere in their bill refer to the particular sec-

448    CREAGHAN vs. M. & C. C. OF BALT.

Opinion of the Court.                                    [132

tion or sections of the ordinance claimed to be open to the objections urged against it, and the enforcement of which would operate to their injury. Nor have counsel for the appellants in their brief pointed out the particular sections, or provisions thereof, falling within the condemnation of the rules for which they contend.

While the enforcement of a void ordinance may be enjoined at the instance of a party whose interests will be injuriously affected by its execution (*Page* v. *Baltimore,* 34 Md. 558; *Deems* v. *M. & C. C. of Baltimore,* 80 Md. 164), the well established rule in this State is that a statute may be valid in part and void in part, even where the two parts are contained in the same section, "provided that the valid part is independent of, and severable from, that which is void." *Steenken* v. *State,* 88 Md. 708; *Welch* v. *Coglan,* 126 Md. 1. And the same rule applies to ordinances. *Field* v. *Malster,* 88 Md. 691. As we have said, the bill alleges that "many portions of said ordinance are void," without specifying the particular provisions or sections objected to, while the prayer of the bill is that the "ordinance and each and every part thereof" be declared null and void. Where an ordinance contains many sections and provisions, and is an amendment of and an addition to an article of the Code containing numerous other sections and provisions dealing with the same subject-matter, in connection with which the ordinance must be construed, good pleading would at least require the plaintiff to point out the sections and provisions claimed to be unconstitutional, with sufficient averments to show that his interests would be injuriously affected by their enforcement.

The main objections urged against the ordinance in question, as gathered from the very general allegations of the bill, are:

1.    That the Mayor and City Council of Baltimore had no authority to pass it.

2.    That it is unconstitutional in that it deprives the plaintiffs of their property without due process of law.

CREAGHAN vs. M. & C. C. OF BALT.     449

Md.]                    Opinion of the Court.

3. That it attempts to confer upon the Commissioner of Health unlimited discretion in granting, refusing and revoking permits therein provided for.

4. That it fails to provide "for proper notice and hearing or appeal from the results of the exercise of such discretion."

5. That it attempts to delegate legislative power to the Commissioner of Health, "in that it attempts to empower him to make regulations for the sale of milk," etc.

1. The Baltimore City Charter (Act of 1898, Chapter 123) expressly authorizes the Mayor and City Council of Baltimore "To provide by ordinance for the proper inspection of milk or any and all other food products offered for sale in the City of Baltimore or intended for consumption therein," and further declares that the city shall "have and exercise within the limits of the City of Baltimore all the power commonly known as the police power to the same extent as the State has or could exercise said power within said limits." The ordinance in question was passed in the exercise of the police power thus expressly conferred upon the Mayor and City Council, and can not therefore be said to be without legislative sanction and authority. *Deems* v. *Ballo.*, *supra*.

2. All of the other objections, as we have enumerated them above, are fully covered and disposed of by the decisions of this Court.

In the case of *Boehm* v. *Baltimore*, 61 Md. 259, JUDGE MILLER, speaking for the Court, said: "Under the power 'to pass ordinances to preserve the health of the city, to prevent and remove nuisances, and to prevent the introduction of contagious diseases,' the Mayor and City Council of Baltimore enacted, among others, two ordinances * * *. By the first of these ordinances it is provided that no person shall remove the contents of any privy, well or sink, within the limits of the city, without having first obtained a license so to do, and every person who may obtain such license 'shall be

considered as subject to the orders of the Board of Health in all matters relating to the opening and cleaning of privies or vaults, time and manner of removal, and the presentation of statistics connected with the cleaning of privies, as also the place or places to which night soil may be removed, and for any refusal or neglect to obey the orders of the Board of Health as herein provided, it shall be the duty of the Comptroller, upon the written request of the Commissioner of Health, to revoke the license of the person or persons so refusing or neglecting to obey.' By the second it is enacted, that every person desiring such license shall make a written application therefor, to the Comptroller, who, after conference with the Board of Health, and on being satisfied with the character of the applicant, the security and tightness of his carts, that he is the owner of such as are specified in his application, and that he is not in collusion or combination with others to defraud the city, may grant him a license for one year, and renew the same from time to time, upon his paying for such license, and each renewal of the same, the sum of $2.50 for each and every cart; 'and the Comptroller upon complaint of the Health Commissioner may revoke or suspend any such license.' * * * The validity of these ordinances was not seriously questioned in argument. That they are a lawful and proper exercise of the power 'to preserve the health of the city and to prevent and remove nuisances,' does not admit of doubt. Such powers have been universally granted to municipal corporations in this country. In fact the preservation of the health and safety of the inhabitants is one of the chief purposes of local government, and reasonable by-laws, in relation thereto have always been sustained in England, as within the incidental authority of such corporations. Under such a power a municipal corporation has the undoubted right to pass ordinances creating boards of health, appointing health commissioners, with other subordinate officials, regulating the removal of house dirt, night soil, refuse, offal and filth, by persons licensed to perform such work, and providing for the prohibition, abatement and sup-

pression of whatever is intrinsically and inevitably a nuisance. * * * There is no similarity between these ordinances, and the one pronounced inoperative and void in *Radecke's case,* 49 Md. 217. The mischief against which they are directed, and the object sought to be attained by their enactment, are altogether different from those with which the ordinance in that case professed to deal, and we have no hesitation in declaring them not only free from the objections which were held fatal to that ordinance, but in every respect reasonable and proper. The subject-matter dealt with by these ordinances required the adoption of very stringent rules and regulations, and such is the character of their provisions. Every person obtaining a license to perform this offensive, but necessary work, is very properly subjected to the orders of the Board of Health in all matters pertaining to the manner of doing it. By one of the ordinances it is provided that 'for any refusal or neglect to obey the orders of the Board of Health, as herein provided, it shall be the duty of the Comptroller, upon the written respect of the Commissioner of Health, to revoke the license,' and by the other power is given him to revoke or suspend the license upon the complaint of the same officer. We do not interpret these provisions as requiring the Comptroller, before he acts, to investigate and determine the reasonableness or truthfulness of the charges or complaints made by the Health Commissioner. Prompt and decisive action is what is contemplated and required, for it is manifest that such work could not be done, even for a short time, in an improper manner without serious danger to the public health. In the one case it is made his duty to act immediately 'upon the written request,' and in the other he may act upon the simple complaint of the Health Commissioner. The plea avers there was in this case both the 'complaint and written request,' and we are of opinion it is a bar to this action against the city." In the case of *Commissioners of Easton v. Covey,* 74 Md. 262, the Court had to deal with the validity of an ordinance passed by the Commissioners of Easton, which provided: "It shall not

be lawful for any person or persons to erect or build any dwelling-house, barn, shed, stable, storehouse, warehouse or shop, within the limits of this town, or any porch on any part of the sidewalks, without first obtaining a permit from the Commissioners of the town, through their clerk, to erect the same, for which one dollar shall be paid for each and every permit so granted," etc.    In that case it was argued by counsel for the appellee: "The ordinance does not profess to regulate the erection of buildings, or to lay down general rules governing their construction, or to prescribe limits within which any given business can be conducted.    But the construction sought to be placed upon it by the defendants 'would commit to the unrestrained will of the Commissioners the power to say whether or not any building, of any character whatsoever, should hereafter be erected in the town of Easton.'    It 'lays down no rules by which its impartial execution can be secured, or partiality and oppression prevented.'    Such a construction would make the ordinance one which in the language of MR. JUSTICE MILLER, hardly falls within the 'domain of law.'    *Balto.* v. *Radecke,* 49 Md. 230."    After holding that the Commissioners had the power to pass the ordinance, this Court then said: "We also think it equally clear, that an ordinance passed under this clause to *regulate* the erecting of any buildings within the corporate limits, by providing that no such building shall be erected without a permit therefor, first obtained from the Commissioners, is not only reasonable, but useful, if not essential to the welfare and prosperity of the town.    Like ordinances have been passed by the corporate authorities of other towns and cities under just such general grants of power as this, and we have found no case in which their validity has been denied.    The ordinance which was declared unreasonable and void in *Radecke's case,* was one which gave to the Mayor the unrestrained and absolute power at his own mere will and pleasure to revoke any and every permit which had already been granted for the use of steam engines and boilers, in the City of Baltimore, but at the same time the Court was careful to say that in

deciding *that ordinance* to be void, they were not to be understood as expressing any disapproval of a previous one which required a permit for the erection of every such engine within the city limits."

In *Deems* v. *M. & C. C. of Ballo., supra,* the Court had under consideration an ordinance of the Mayor and City Council of Baltimore making it unlawful for any person to sell or offer for sale any impure, adulterated, sophisticated or unwholesome milk or other food products; and providing that only pure, unadulterated, unsophisticated and wholesome milk should be sold, and that such article should be understood to be the natural product of healthy cows which had not been deprived of any part of its cream, and to which no additional liquid or solid preservative had been added, and having the specific gravity therein mentioned. It also provided for the appointment of a competent chemist, who should make such chemical and microscopical examinations as might be required under the ordinance, and for the appointment also of three inspectors of foods, and by section 6 further provided: "And milk or food products in the possession of the person or persons so violating, disobeying, refusing or neglecting to comply with the provisions of this ordinance may be confiscated and destroyed by the inspector examining the same." The bill was filed by a dairyman, who conducted a retail business for the sale of milk, and alleged that a certain inspector, etc., without making any chemical or microscophical examination thereof, and without due process of law, poured his milk out upon the streets and down the gutters of the city, thereby wasting and destroying the same. It further alleged that the ordinance, and particularly section 6 thereof, was void, and prayed for an injunction restraining the Mayor and City Council and the other defendants "from taking and destroying, without chemical or microscophical examination first made, and without due process of law first had, any milk or other dairy product, the property of the complainant." It was urged by counsel in that case that a municipal corporation could not impose a *forfeiture* of prop-

erty without expressed legislative authority; that the power conferred upon the Mayor and City Council did not authorize an unlimited control over the business occupations of the people; and that the power to regulate did not include a power to confiscate and destroy; that the municipal authorities had no power to declare any particular business a nuisance in a summary mode, and enforce their decisions at their pleasure; that by the ordinance there in question the determination of the quality of all milk offered for sale in Baltimore City was left to the arbitrary decision of an inspector, from whom there was no appeal, who was licensed to destroy the property of the citizen at his pleasure, and by spilling the milk to render impossible any investigation respecting the honesty of his conclusions; that by the exercise of such a power any dairyman conducting an honest and legitimate business could, under color of law, be absolutely ruined and his business be destroyed, or the inspector could secure the consignment of all shipments of milk from the counties to himself in the City of Baltimore, thereby guaranteeing the shipper against the destruction of his property for a pecuniary consideration, and that the ordinance attempted to confer an absolute and irresponsible power controlling the entire trade. In sustaining the ordinance, CHIEF JUDGE ROBINSON said: "Nor can there be any question as to the power of the appellee to provide by ordinance for the inspection of milk offered for sale within its corporate limits, and to forbid the sale of any milk which does not come up to the standard or test prescribed by the ordinance. And the real question it seems to us under the demurrer, is whether it has the power to direct that milk which is found upon inspection not to come up to the standard, as thus prescribed, *shall be destroyed?* * * * Every well organized government has the inherent right to protect the health and provide for the safety and welfare of its people. It has not only the right, but it is a duty and obligation which the sovereign power owes to the public, and as no one can foresee the emergency or necessity which may call for its exercise, it is not an easy matter to prescribe the

precise limits within which it may be exercised. * * * 'Property of every kind,' says MR. JUSTICE STORY, 'is held subject to those general regulations which are necessary for the common good and general welfare. And the Legislature has the power to define the mode and manner in which every one may use his property.' 2 Vol., *Story Const.* And in the late case of *Mugler* v. *Kansas,* 123 U. S. 623, after considering the constitutional limitations which declare that no person shall be deprived of his property or liberty without due process of law, the Supreme Court says these limitations 'have never been construed as being incompatible with the principle equally vital, because so essential to the peace and safety, that all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community.' To justify such interference with private rights, its exercise must have for its immediate object the promotion of the public good, and, so far as may be practicable, every effort should be made to adjust the conflicting rights of the public and the private rights of individuals. At the same time the emergency may be so great, and the danger to be averted so imminent, that private rights must yield to the paramount safety of the public, and to await, in such cases, the delay necessarily incident to ordinary judicial inquiry, in the determination of private rights, would defeat altogether the object and purposes for which the exercise of this salutary power was invoked. Whatever injury or inconvenience one may suffer in such cases, he is, in the eye of the law, compensated by sharing the common benefit resulting from the summary exercise of this power, and which, under the circumstances, was absolutely necessary for the protection of the public. The use of milk as an article of food enters largely, as we all know, in the daily consumption of every household, and there is no more fruitful source of disease than the use of adulterated and unwholesome milk. And if the appellant's contention be right, that the question whether or not milk, which is daily offered for sale in every part of a large and populous city, comes up to the standard prescribed by the

ordinance, must be determined by the ordinary process of judicial investigation or by chemical analysis, it would be impossible to prevent the danger to the public health necessarily resulting from impure and unwholesome milk. It is in the exercise of this power that quarantine laws, which not only interfere with private rights, but with the liberty of persons, are passed; and also, laws which provide for the destruction of infected clothing to prevent the spread of contagious diseases. And as to the extent and the summary manner in which this power may be exercised to protect the public health, we may refer to *Boehm's case,* 61 Md., 264; *Train* v. *Boston Disinfecting Co.,* 144 Mass. 523, and *Newark Horse Car Rwy v. Hunt,* 50 N. J. L. 308."

In the case of *State* v. *Broadbelt,* 89 Md. 565, the appellee, a dairyman engaged in supplying milk to cities, towns and villages within this State, was indicted under the Act of 1898, Chapter 306, for failing, neglecting and refusing to register his herd of cattle with the Live Stock Sanitary Board, and he demurred to the indictment upon the ground that the statute was unconstitutional in that it deprived "the individual of the due process of law secured by" the Fourteenth Amendment to the Federal Constitution, and by Article 23 of the Maryland Declaration of Rights, etc. In disposing of the case, CHIEF JUDGE McSHERRY, after stating that the entire Act was strictly a police regulation, enacted for the purpose of preserving the public health, and after referring to the danger arising from the use of impure milk, said: "Thorough inspections of cattle and dairies may reduce the frequency of infection. The preservation of the public health by preventing the sale of infected milk, or of milk that may come from infected sources, when milk by reason of its almost universal use in one form or another as an article of food is especially likely to spread disease, is one of the most imperative duties of the State, and obviously one most incontestably within the scope of the police power. As a means to that end—the preservation of the public health—

a requirement that every person selling milk for consumption
in cities, towns and villages shall cause his herd of cattle to
be registered with the Live Stock Santiary Board, is a rea-
sonable and an appropriate enactment; and the subsequent
provisions are necessary parts of the scheme. The 19th Sec-
tion no more deprives the individual of due process of law
than did the ordinance in *Easton* v. *Covey,* 74 Md. 262,
which prohibited the erection of any building without a per-
mit from the commissioners of the town; or an ordinance for-
bidding the keeping of swine without a permit in writing
from the Board of Health, *Quincy* v. *Kennard,* 151 Mass.
563; or an ordinance requiring the written permission of
the Mayor of a town before any person was allowed to move
a building along the streets, *Wilson* v. *Eureka City,* 173 U.
S. 32 (decided February 20th, 1899); or the ordinance
requiring a license for the removal of the contents of privies,
and subjecting the holders of such license to the orders of
the Board of Health, *Boehm* v. *Mayor, etc., Balto.,* 61 Md.
259. The constitutional limitations which declare that no
person shall be deprived of his property or liberty without
due process of law have never been construed as being 'incom-
patible with the principle—equally vital, because essential
to the peace and safety of society—that all property in this
country is held under the implied obligation that the owner's
use of it shall not be injurious to the community. * * * The
exercise of the police power by the destruction of property
which is itself a public nuisance, or the prohibition of its
use in a particular way, whereby its value becomes depre-
ciated, is very different from taking property for public use,
or from depriving a person of his property without due proc-
ess of law.' *Mugler* v. *Kansas,* 123 U. S. 623."

In *M. & C. C. of Balto.* v. *Wollman,* 123 Md. 310, this
Court, speaking through JUDGE BRISCOE, said: "The right
to delegate power by municipal authorities rests upon the
same principle and is controlled in the same way as the
delegation of the legislative power by the State. * * * We

think, that fixing the rent of market stalls in the City of Baltimore is an administrative and not a legislative function, and may be delegated to the clerks of the markets, as provided by the ordinance in question."

In the case of *State* v. *Normand,* 85 Atl. 899, the Supreme Court of New Hampshire, dealing with a provision authorizing the State Board of Health "to make all necessary rules and regulations for the enforcement of the provisions of" an Act forbidding "The existence or maintenance of any unclean, unhealthy or unsanitary condition or practice in any establishment or place where food is produced, manufactured, or stored or sold, or any car or vehicle used for the transportation or distribution thereof," said: "The delegation of said power is not unusual. The State Board of Cattle Commissioners is authorized to make such 'regulations as the board deems necessary to exclude or arrest' diseases in cattle. Each board of medical examiners 'may make any by-laws and rules not inconsistent with law, necessary in performing its duties.' * * * The inspector of steamboats may make rules and regulations. * * * Similar power is given to the commissioner of pilotage. * * * And numerous other instances might be cited of powers given to public administrative authorities to make rules for the enforcement of specific laws. If such rules are not unreasonable, and if they are not repugnant to the laws of the State or the Constitution, they are usually upheld as the exercise of power specially conferred by the Legislature for the more efficient enforcement of the statutes to which they relate. 'As the possessor of the lawmaking power,' the Legislature may confer authority and impose duties upon others and regulate the exercise of their several functions. It may pass general laws for that purpose, giving them expressly or by necessary implication an incidental discretion to employ the proper means to fill up and replace the details for themselves and subordinates, though the exercise of that discretion be *quasi-judicial.* * * * It can not be said that every grant of power to executive or administrative

boards of officials, involving the exercise of discretion and judgment, must be considered a delegation of legislative authority. While it is necessary that a law, when it comes from the lawmaking power, should be complete, still there are many matters relating to methods or details, which may be by the Legislature referred to some designated ministerial officer or body. All such matters fall within the domain of the right of the Legislature to authorize an administrative board or body to adopt ordinances, rules, by-laws or regulations in aid of the successful execution of some general statutory provision. *Blue* v. *Beach,* 155 Ind. 121, 132; 56 N. E. 89, 93 (50 L. R. A. 64, 80 Am. St. Rep. 195). In that case it was held that under a general statutory authority to prevent the spread of contagious and infectious diseases, a rule of the State Board of Health upon the subject of vaccination was not legislative. In *Isenhour* v. *State,* 157 Ind. 517, 62 N. E. 40, 87 Am. St. Rep. 228, it was held that a provision of the pure food law, that the Board of Health should adopt resolutions necessary to facilitate the law's enforcement and prepare rules regulating minimum standards of foods and defining specific adulterations was not a delegation of legislative power."

Without attempting to refer to the various sections of the ordinance, or the many provisions contained therein, a reference to Section 55A will serve to show the general character of the provisions made by the ordinance and of the powers conferred upon the Commissioner of Health. Section 55D, as ordained by Ordinance No. 103 of 1908, declares:

"The Commissioner of Health shall have power to adopt such regulations as may be deemed proper and necessary to insure all milk and cream intended for consumption in Baltimore City being produced, transported, stored, kept, distributed, retailed and delivered under conditions rendering them suitable for consumption as human food, and to compel perfect hygienic and suitable conditions of all cow stables, creameries

and dairies from which milk and cream so intended for consumption in Baltimore City are produced; such regulations not to be inconsistent with existing laws or ordinances, and copies of the same to be printed and kept for free distribution to the public; and said Commissioner of Health shall have power to prohibit the sale within the corporate limits of Baltimore City of milk or cream produced, transported, stored, kept or distributed, retailed or delivered contrary to such regulations, whether such milk or cream be produced within or outside of the corporate limits of the City of Baltimore; and to the end that said regulations may be enforced in cases of milk or cream produced outside of the corporate limits of the City of Baltimore, but intended for consumption therein, said Commissioner of Health may require such of the city milk inspectors as he may designate for the purpose to make inspections at such intervals and times as he may deem expedient of all dairy farms, stables and other places outside of the City of Baltimore from which milk or cream are shipped for consumption in Baltimore City. In case full access to such premises or full opportunity to investigate all the conditions under which milk is there produced or kept shall be denied said inspectors, or in case upon such inspection the conditions are found such as in the opinion of the said Commissioner of Health render such milk or cream unsuitable or unsafe for human food and warrant the exclusion of said milk or cream from sale in Baltimore City, said Commissioner of Health shall have power to absolutely prohibit the sale thereof at any place in Baltimore City until such time as the reason for their exclusion shall in his opinion have ceased, and he shall adopt such means of identifying such milk or cream as to him may seem proper and expedient," etc.

And Section 55A of the Ordinance in question in this case provides:

"Every person or corporation desiring to bottle or handle for sale, or to offer or expose for sale, or to

sell, dispose of, exchange or deliver milk or cream
(the words 'milk or cream' as herein used being in-
tended to mean milk, cream, skimmed milk, butter-
milk or other fermented milk) or to manufacture for
sale ice cream or butter, in the City of Baltimore,
shall make application to the Commissioner of Health
for a permit so to do."

It provides that the application shall be made on a printed
form to be furnished by the Commissioner of Health, and
what the application shall contain, and then provides:

"The Commissioner of Health, upon receipt of such
application, shall cause to be investigated the place of
business described in such application and the wagons
or other vehicles, if any, intended to be used by such
applicant. If such places of business and such wagons
and other vehicles are found, upon such investigation,
to be in a sanitary condition and fit for the uses and
purposes for which they are intended to be put, said
Commissioner of Health shall forthwith register said
applicant in a proper record to be kept for the pur-
pose, and issue a permit authorizing such applicant to
carry on, engage in and conduct the business applied
for in Baltimore City at the place designated in such
application. Such permits shall specify the kind or
kinds of business to be conducted. All permits granted
pursuant to this ordinance may at any time be re-
voked by the Commissioner of Health for the persist-
ent, repeated or willful violation of any law or ordi-
nance, or for any regulations of the Commissioner of
Health, governing the handling or sale of milk or
cream, or the manufacture for sale of ice cream or
butter in Baltimore City; provided, however, that no
such permit shall, at any time, be revoked by the
Commissioner of Health unless he shall first have
given the holder of the same not less than ten days'
notice in writing of his intention to revoke such per-
mit, and an opportunity to be heard by him as to why
such should not be done, this proviso not to be taken to

apply to cases where the sale of milk or cream or the manufacture for sale of ice cream or butter may be temporarily prohibited by the Commissioner of Health because of disease, temporary unsanitary conditions or similar causes."

This section further provides that the permits shall not be transferable, and if the person or corporation having the permit shall change the location of his place of business, notice of such proposed change shall be given to the Commissioner of Health, and also provides that any person who sells or offers for sale milk, etc., in Baltimore City, without having a permit to do so, shall be subject to a fine of not less than five nor more than one hundred dollars for each offense.

It would seem clear that the provisions of this section are entirely within the reasonable exercise of the powers conferred upon the Mayor and City Council of Baltimore. The permits provided for are issued to those complying with its provisions, and whose places of business, wagons, etc., are found, upon investigation, to be in a sanitary condition and fit for the purposes for which they are intended, and are revocable by the Commissioner of Health for the persistent, repeated or willful violation of any law or ordinance, or any regulation of the Commissioner of Health, governing the handling or sale of milk or cream, or the manufacture for sale of any ice-cream or butter in Baltimore City, after notice to the holder of the permit, and after he has had an opportunity to be heard. The ordinance does not attempt to delegate legislative power to the Commissioner of Health, but authorizes him to exact compliance with the *provisions thereof and with such regulations* as he has adopted for *their enforcement,* and gives him only such discretion as is necessary in the proper execution of a law or regulation designed to prevent the introduction and sale of impure milk, etc., in Baltimore City.

In reference to the averment that "owing to war conditions," and the scarcity of labor and metal, the plaintiffs have not been able within the five months allowed by section 6 to make the changes in their dairies and on their farms required by the provisions of the ordinance, it is sufficient to say that it presents no ground for holding unreasonable, or enjoining the enforcement of, an ordinance deemed necessary for the proper discharge of the imperative duty of the city to preserve the public health.

*Radecke's case,* 49 Md. 217; *State* v. *Mott,* 61 Md. 297; *Bostock* v. *Sams,* 95 Md. 400, and *Hagerstown* v. *B. & O. R. R. Co.,* 107 Md. 178, upon which the appellants largely rely, deal with ordinances entirely unlike the one now under consideration. *Radecke's case* was referred to by JUDGE MILLER, in *Easton* v. *Covey, supra,* as not in conflict with the latter decision, and in *Hagerstown* v. *B. & O. R. R. Co., supra,* JUDGE BRISCOE, after observing that *Easton* v. *Covey, supra,* was unlike that case, said: "And in holding this ordinance void and invalid for the reasons stated, we contravene no decision in our own State, and impose no unnecessary restraints upon the action of municipal bodies within proper and constitutional limitations."

The cases from which we have quoted have not been overruled by the later decisions of this Court, and they fully sustain the provisions of the ordinance in question.

*Decree affirmed, with costs.*